LaKisha NEAL–LOMAX; LaKisha Neal–Lomax as parent and guardian of Joshua William Lomax; LaKisha Neal–Lomax as parent and guardian of Aliaya Tierraee Lomax; Juanita Carr as parent and guardian of Inique Alazya Lomax, and Joyce Charleston, individually and as Special Administrator of the Estate of William D. Lomax, Jr., Plaintiffs,

v.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT; Officer Reggie Rader; Taser International, Inc., an Arizona Corporation; and Taser International, Inc., a Delaware foreign corporation, Defendants.

No. 2:05CV–01464–PMP–RJJ.

United States District Court,
D. Nevada.

Sept. 2, 2008.

See also 574 F.Supp.2d 1170, 2008 WL 4054307.

Dominic P. Gentile, Gordon & Silver, Ltd., Jerome A. Depalma, Gentile Depalma, Ltd., Robert T. Eglet, Bradley J. Myers, Robert W. Cottle, Mainor Eglet Cottle, Las Vegas, NV, for Plaintiffs.

Peter M. Angulo, Olson Cannon, Gormley & Desruisseaux, Walter R. Cannon, Rawlings Olson Cannon, et al., Brent D. Quist, Mark Albright, Albright Stoddard Warnick et al., Las Vegas, NV, David T. Ballard, Barnes & Thornburg LLP, Chicago, IL, Holly L. Gibeaut, Michael A. Brave, Taser International, Inc., Scottsdale, AZ, J. Curtis Greene, John R. Maley, Barnes & Thornburg LLP, Indianapolis, IN, for Defendants.

## ORDER

PHILIP M. PRO, District Judge.

Presently before the Court is Defendant Taser International, Inc.'s Motion for Summary Judgment (Doc. # 248), argued on June 9, 2008. Plaintiffs filed a Supplement (Doc. # 347) on June 11, 2008. Defendant Taser International, Inc. filed an Opposition (Doc. # 348) to Plaintiffs' Supplement on June 16, 2008. Defendants Las Vegas Metropolitan Police Department and Reggie Rader filed an Opposition (Doc. # 349) to Plaintiffs' Supplement on June 18, 2008.

## I. BACKGROUND

This case arises out of the death of William Lomax ("Lomax") after a struggle with police and security officers during which Las Vegas Metropolitan Police Department ("LVMPD") police officer Reggie Rader ("Rader") used a Taser on Lomax. Defendant Taser International, Inc. ("TI") manufactures the Taser device Rader used on Lomax. (Def. Taser Int'l, Inc.'s Global App. X, Ex. 42 at ¶ 5.)[1] The facts regarding the incident are set forth in full in the Court's Order ruling on Defendants LVMPD and Rader's Motion for Summary Judgment entered this date. The Court will not repeat the factual recitation here.

Plaintiffs filed a Second Amended Complaint (Doc. # 125) asserting against Defendant TI claims for strict products liability for negligent design (count six), strict products liability for negligent manufacturing (count seven), strict products liability for warning defects (count eight), and negligence (count nine). Defendant TI now

---

1. The Court hereafter will refer to Defendant Taser International, Inc.'s exhibits submitted in support of its motion for summary judgment by appendix and exhibit number.

moves for summary judgment on all claims. Defendant TI argues no reasonable jury could find Lomax was not more at fault for his death than TI, and Lomax assumed the risk of consuming drugs and resisting officers. TI argues it is entitled to summary judgment on the strict liability claims because Plaintiffs cannot show there was a defect in the design, manufacture, or warnings of the Taser device. TI also contends it is not liable under the sophisticated purchaser/bulk supplier doctrine. Additionally, TI argues no reasonable jury could find in favor of Plaintiffs on the issue of causation. Finally, TI asserts Plaintiffs' punitive damages claim fails as a matter of law.

Plaintiffs respond by abandoning their negligence and manufacturing defect claims. As to the design defect claim, Plaintiffs argue the Taser is defective because it is designed to be non-lethal yet it caused or contributed to Lomax's death. Plaintiffs argue TI's warnings also were defective because TI failed to warn Lomax or LVMPD that the Taser could cause death in certain high risk individuals such as Lomax. Plaintiffs argue a reasonable jury could find in their favor on causation due to the testimony of Plaintiffs' experts who have testified a Taser may contribute to death under certain circumstances. Finally, Plaintiffs argue the Court should permit the question of punitive damages to remain pending presentation of evidence at trial.

## II. LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All justifiable inferences must be viewed in the light most favorable to the non-moving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. *Id.*; *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). The party opposing summary judgment "must cite to the record in support of the allegations made in the pleadings to demonstrate that a genuine controversy requiring adjudication by a trier of fact exists." *Taybron v. City & County of San Francisco*, 341 F.3d 957, 960 (9th Cir. 2003). A district court is not required to comb the record looking for genuine issues of material fact that a party does not bring to the court's attention. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028–31 (9th Cir.2001).

## III. DISCUSSION

### A. Abandoned Claims: Counts Seven and Nine

In their brief opposing summary judgment, Plaintiffs abandoned their claim for strict products liability based on a manufacturing defect in count seven of the Second Amended Complaint. (Pls.' Opp'n [Doc. # 312] at 27.) At the June 9, 2008 hearing on TI's motion for summary judgment, Plaintiffs abandoned their negligence claim in count nine of the Second Amended Complaint. The Court therefore will grant summary judgment in TI's favor on counts seven and nine of the Second Amended Complaint.

## B. Strict Products Liability Claims

 To establish a strict products liability claim under Nevada law, a plaintiff must show: "1) the product had a defect which rendered it unreasonably dangerous, 2) the defect existed at the time the product left the manufacturer, and 3) the defect caused the plaintiff's injury." *Fyssakis v. Knight Equip. Corp.*, 108 Nev. 212, 826 P.2d 570, 571 (1992). A product is defective if it is unreasonably dangerous. *Stackiewicz v. Nissan Motor Corp. in U.S.A.*, 100 Nev. 443, 686 P.2d 925, 928 (1984). A product is unreasonably dangerous if it fails to perform "in the manner reasonably to be expected in light of [its] nature and intended function" and "was more dangerous [than] would be contemplated by the ordinary user having the ordinary knowledge available in the community." *Allison v. Merck & Co., Inc.*, 110 Nev. 762, 878 P.2d 948, 952 (1994) (quotations omitted); *Stackiewicz*, 686 P.2d at 928. Evidence the product in question "lacked adequate safety features or that a safer alternative design was feasible at the time of manufacture will support a strict liabilities claim." *Fyssakis*, 826 P.2d at 572.

 Even if a product is faultlessly made, the manufacturer may be strictly liable if it was " 'unreasonably dangerous to place the product in the hands of the consumer without adequate warnings concerning its safe and proper use.' " *Yamaha Motor Co., U.S.A. v. Arnoult*, 114 Nev. 233, 955 P.2d 661, 665 (1998) (quoting *Oak Grove Investors v. Bell & Gossett Co.*, 99 Nev. 616, 668 P.2d 1075, 1080 (1983)). " 'Where the defendant has reason to anticipate that danger may result from a particular use of his product, and he fails to warn adequately of such a danger, the product sold without a warning is in a defective condition.' " *Id.* (quoting *Oak Grove Investors*, 668 P.2d at 1080). The warnings must communicate adequately any dangers that may result from the products use or foreseeable misuse. *Fyssakis*, 826 P.2d at 571–72. Whether the defendant gave adequate warnings usually is a jury question. Oak *Grove Investors*, 668 P.2d at 1080.

 To establish causation, a plaintiff must produce medical expert testimony opining to a reasonable degree of medical certainty that the allegedly defective product caused the plaintiff's injury. *See Morsicato v. Sav–On Drug Stores, Inc.*, 121 Nev. 153, 111 P.3d 1112, 1116 (2005); *United Exposition Serv. Co. v. State Indus. Ins. Sys.*, 109 Nev. 421, 851 P.2d 423, 425 (1993). A possibility that the product caused the injury is insufficient. *United Exposition Serv. Co.*, 851 P.2d at 425. Nevada requires such expert testimony because "if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment." *Morsicato*, 111 P.3d at 1116 (quotation omitted).

Defendant TI markets the Taser as a less than lethal tool that is able to safely subdue individuals without causing permanent injury or death (absent other circumstances, such as falling injuries or combustion). Consequently, a Taser that caused a death under the factual scenario presented in this case would fail to perform in a manner reasonably expected in light of its nature and intended function, and would be more dangerous than a law enforcement officer using a Taser would expect. Indeed, Defendant TI continues to assert in this litigation that the Taser could not have caused Lomax's death.

However, Plaintiffs must raise a genuine issue of material fact that the allegedly defective product caused Lomax's death. To establish causation, Plaintiffs argue the

timing of events alone raises a genuine issue of material fact as to causation. Additionally, Plaintiffs offer the testimony of four experts: Mark Rhodes, an electrical engineer; Dr. Knoblock, the coroner who performed Lomax's autopsy; Brett H. Woodard, M.D., a forensic pathologist; and Jared Strote, M.D., an emergency room physician.

### 1. Timing

Plaintiffs argue that because at least one witness testified Lomax went limp immediately after the last Taser discharge, and several witnesses testified they found Lomax not breathing within minutes after the last Taser discharge, a genuine issue of material fact exists regarding causation. Defendant TI responds that other witnesses testify Lomax was belligerent, struggling, and still breathing up to fifteen minutes after the last Taser application. According to Defendant TI, even the witnesses upon which Plaintiffs rely suggest several minutes passed from the time of the last Taser application until Lomax was moved to the back of the ambulance, medical personnel began to assess him, and subsequently discovered he was not breathing. Finally, Defendant argues timing alone cannot support a finding of causation in this case.

Viewing the facts in the light most favorable to Plaintiffs, the Court will assume Lomax became limp or docile after the last Taser application and that he was moved to the back of the ambulance and discovered not to be breathing shortly thereafter. Nevertheless, timing alone cannot support causation in this case.

Under Nevada law, Plaintiffs must produce medical expert testimony to establish causation, particularly where the cause of death is not immediately apparent. Lomax was obese, under the influence of PCP, and his heart was racing even before he began to struggle with the housing security officers. (App. XIII, Ex. 46 at 63;

App. XIV, Ex. 68.) Additionally, the autopsy and medical records at the time of the incident revealed Lomax had bronchopneumonia, interstitial fibrosis in the heart, and acidosis. (App. XIII, Ex. 47; App. XIV, Ex. 67.) Medical records in Lomax's medical history indicate Lomax had a slightly enlarged heart and previously suffered from hypertension. (App. XII, Ex. 51; App. XV, Ex. 75.) Consequently, Lomax faced a variety of medical conditions and factors that may have caused or contributed to his death.

Because the cause of Lomax's death is not immediately apparent, the temporal proximity of the last Taser application and Lomax's death cannot, by itself, raise a genuine issue of material fact as to causation. Dr. Knoblock and Plaintiffs' own expert testified Lomax might have died even without the Taser discharges. (Pls.' Opp'n [Doc. # 297], Ex. 1 at 113; App. XV, Ex. 75 at 87.) Consequently, timing alone cannot support causation in this case. *See Lash v. Hollis*, 525 F.3d 636, 641 (8th Cir.2008) (concluding that given the multiple possible causes of liver failure of a person who was subject to Taser discharges, and given the "complex and uncertain chain of causation," the plaintiffs were required to present "specific and detailed expert testimony" as to causation).

### 2. Experts Mark Rhodes and Dr. Knoblock

Plaintiffs refer to the expert opinions of Mark Rhodes ("Rhodes"), an electrical engineer, and Dr. Knoblock, who performed Lomax's autopsy. However, Plaintiffs do not point to anywhere in the record where either Rhodes or Dr. Knoblock state to a reasonable degree of medical certainty that the Taser caused or contributed to Lomax's death.

#### a. Rhodes

Rhodes has a Ph.D. in Engineering from the University of California, Los Angeles,

majoring in applied plasma physics and minoring in quantum electronics and microwave electronics. (App. VII, Ex. 25 at 1.) Rhodes is a California licensed electrical engineer with twenty years of experience as a practicing research engineer, and nine years of experience as an expert witness and forensic engineer. (*Id.*)

In his initial expert report, Rhodes opined that "the multiple Taser applications combined with positional asphyxia and bronchopneumonia initiated respiratory arrest after which [Lomax's] heart stopped beating." (*Id.* at 2.) Rhodes also opined that Lomax went into respiratory arrest as a result of numerous factors, including that Lomax was lying on his stomach with his hands cuffed behind him, was obese and had pneumonia, and had been struggling with several officers. (*Id.* at 3.) According to Rhodes, the multiple Taser discharges to Lomax's neck "more likely than not" acted on the phrenic nerve, which controls the diaphragm, the main muscle responsible for pulling air into the lungs. (*Id.*) Rhodes concludes the Taser "was then a substantial contributing factor to the respiratory arrest." (*Id.*) In his rebuttal report, Rhodes opines that "it is more likely than not that multiple application[s] of a Taser to the nerve-rich neck region damaged or disrupted phrenic nerve activity in Mr. Lomax. This in combination with the other factors induced respiratory arrest." (App. VII, Ex. 24 at 7.)

Rhodes does not opine to a reasonable degree of medical certainty that the Taser caused Lomax's death. Rhodes, as an electrical engineer, likely could not offer such an opinion that would satisfy Nevada's rule requiring expert medical testimony as to causation. Even if Rhodes could so opine, he did not do so in this case. Rather, Rhodes opines the Taser "more likely than not" damaged or disrupted the phrenic nerve, thereby disrupting Lomax's

ability to pull in air using his diaphragm, contributing to his respiratory distress. Rhodes' opinion therefore does not raise a genuine issue of material fact as to causation.

### b. Dr. Knoblock

 Dr. Knoblock's autopsy report lists the cause of death as "cardiac arrest during restraining procedures. Phencyclidine intoxication and bronchopneumonia were significant contributing conditions." (App. XIII, Ex. 47.) At the coroner's inquest, Dr. Knoblock testified that PCP ingestion causes "great physiological stress" to the body, including high blood pressure and hyperthermia. (*Id.* at 163.) According to Dr. Knoblock, the struggle, the PCP, and the position in which Lomax was placed decreased his ability to breathe. (*Id.* at 165–67.)

At the inquest, Dr. Knoblock testified that the Taser contributed to Lomax's death because it added to this combination of factors by "contract[ing] the skeletal muscles ... the only ability to breathe would be the skeletal muscles of the ribs to expand your lungs, so for a period of time, multiple times, if you contract those muscles, he is not going to be able to breathe at all, most likely, and I believe that through this entire experience he finally was depleted and went into cardiac arrest." (*Id.* at 167.) However, Dr. Knoblock stated he could not conclude that Lomax would have lived if Rader had not used the Taser on Lomax. (*Id.* at 167–68.) At his deposition, Dr. Knoblock testified that he has no scientific or medical evidence the Taser can kill an adult, or that it causes skeletal muscles to contract when used in the drive stun mode. (App. XV, Ex. 75 at 87.)

Although Dr. Knoblock testified at the coroner's inquest that the Taser contributed to Lomax's death, Plaintiffs do not cite to anywhere in the record that Dr. Knob-

lock has offered the opinion to a reasonable degree of medical certainty that the Taser caused Lomax's death. To the contrary, Plaintiffs concede Dr. Knoblock has not opined the Taser caused Lomax's death:

> In the instant case, Dr. Knoblock conducted the autopsy of Mr. Lomax; thus it is well within Dr. Knoblock's purview to opine that Mr. Lomax's death was caused by several factors including repeated use of a TASER X26. However, Dr. Knoblock has not offered that opinion; rather, Dr. Knoblock stated that he could not attribute Mr. Lomax's death to the TASER X26 nor could he opine that had the TASER X26 not been used, Mr. Lomax would have died or survived.

(Pls.' Opp'n to Taser's Mot. to Limit Test. of Pls.' Expert Ronald J. Knoblock, M.D., From This Litigation [Doc. # 302] at 3.) Because Dr. Knoblock does not offer an opinion to a reasonable degree of medical certainty that the Taser caused Lomax's death, his opinion does not raise a genuine issue of material fact as to causation.

### 3. Brett H. Woodard and Jared Strote

Plaintiffs' two medical experts are Brett H. Woodard ("Woodard") and Jared Strote ("Strote"). Defendant TI moves to exclude these experts' testimony as inadmissible.

Federal Rule of Evidence 702 permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable. The trial court acts as a "gatekeeper" to exclude expert testimony that is not both relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995) (stating testimony is relevant if it "logically advances a material aspect of the proposing party's case"). To be helpful to the jury, the testimony must be " 'tied to the facts' " of the particular case. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)).

■ Expert testimony is reliable if it is "based upon sufficient facts or data," "the product of reliable principles and methods," and the expert "applies the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In *Daubert,* the United States Supreme Court set forth a non-exhaustive list of factors that may guide a court in assessing the reliability of offered testimony:

> (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted.

509 U.S. at 593–94, 113 S.Ct. 2786.

■ However, depending on the type of expert testimony offered, these factors may not be appropriate to assess reliability. *United States v. Sandoval–Mendoza,* 472 F.3d 645, 655 (9th Cir.2006) (citing *Kumho Tire Co., Ltd.,* 526 U.S. at 150, 119 S.Ct. 1167). The *Daubert* factors may have little application to expert testimony based on personal knowledge or experience. *Id.* In such circumstances, the trial court should not apply the *Daubert* factors in an unduly restrictive manner. *Id.* For example, where medical expert testimony is offered, the trial court should consider

"what a good [physician] would in determining what is reliable knowledge in the [medical] profession," and "should admit medical expert testimony if physicians would accept it as useful and reliable." *Id.*

Additionally, the trial court should be mindful that reliability is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir.2007) (quotation omitted). The trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.*, 526 U.S. at 152, 119 S.Ct. 1167. A "significant fact" in making this determination is "whether the expert has developed [his] opinions expressly for purposes of testifying, since a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (quotations omitted). An expert's failure to subject his method to peer-review and to develop an opinion outside the litigation does not necessarily render his opinion inadmissible. *Id.* However, if these guarantees of reliability are absent, the expert must explain his methodology precisely and must "point to some objective source" supporting his methodology. *Id.*

Testimony must be both relevant and reliable to be admissible. *Stilwell,* 482 F.3d at 1192. Whether to admit expert testimony, as well as deciding how to determine the testimony is reliable, lies within the trial court's discretion. *Kumho Tire Co., Ltd.*, 526 U.S. at 152, 119 S.Ct. 1167; *United States v. Calderon–Segura,* 512 F.3d 1104, 1109 (9th Cir.2008). The party offering the expert testimony bears the burden of establishing its admissibility. *Lust,* 89 F.3d at 598.

### a. Woodard

Woodard is a board certified pathologist with a sub-specialty in forensic pathology. (App. VII, Ex. 22 at 1.) Woodard obtained his medical degree at Tulane University and did his residency at Duke University Medical Center and the North Carolina Medical Examiner's office. (*Id.*) Woodard reviews violent and/or unattended deaths in the usual course of his business activities. (*Id.*)

Woodard has performed an autopsy and rendered an opinion on the cause and manner of death in approximately a dozen cases involving electricity as a contributory cause, and one other case involving an electronic control device. (Pls.' Opp'n [Doc. # 297], Ex. 1 ["Woodard Dep."] at 32–33, 51–52.) The other case involving an electronic control device did not result in litigation, and consequently Woodard did not testify as an expert in relation to that case. (*Id.*) Woodard attended an American Academy of Forensic Science meeting at which Tasers were discussed, and he observed a Federal Bureau of Investigation demonstration of Taser applications. (*Id.* at 56–64.)

Woodard reviewed the testimony of the security officers, Officer Rader, the medical personnel, the inquest proceedings, and the medical examiner's reports. (App. VII, Ex. 22 at 1.) Woodard also spent approximately four hours reviewing Defendant's experts' reports. (Woodard Dep. at 21.) Woodard opines as follows:

> To a reasonable degree of medical certainty I can state the following—I concur with the conclusions expressed by the medical examiner that the cause was related to multiple factors secondary to restraint procedures. These factors would include restraint in a face down position, body weight application by restrainer to the chest, physical resistance and agitation by the deceased, obesity of

the deceased, bronchopneumonia, Phencyclidine abuse, and taser administration.

Repetitive and sustained usage of taser would result in forced muscular contractions and interfere with compensatory hyperventilation required for immediate physiologic correction of acidosis. Additionally, repetitive tasing because of response to pain would worsen agitation and resistance. Therefore, it is more likely than not that taser application worsened the decedent's metabolic derangement and was a significant contributing factor to the deceased'[s] ultimate expiration.

(App. VII, Ex. 22 at 1–2.)

Defendant TI moves to strike Woodard's opinions. Defendant TI argues Woodard is not qualified to express an opinion on the Taser's physiological effects because he admits he is not an expert in electronic control devices generally, or the Taser specifically, and Woodard made no attempt to educate himself on the Taser's effects even after being retained. Additionally, TI argues Woodard did not base his opinion on sufficient facts because he did not review Lomax's medical history or review the histologic slides from the autopsy.

TI also asserts Woodard's opinions are not the results of methodology being reliably applied to the facts because Woodard did nothing beyond reviewing witness statements and the autopsy report. TI contends Woodard's conclusions are suspect given that he cannot point to any peer reviewed scientific studies that support his conclusion, and he failed to address Taser studies that contradicted his opinions. Finally, TI argues Woodard's testimony is unhelpful to the jury because he cannot quantify what he means by stating the Taser was a "significant" contributing factor to Lomax's death.

Plaintiffs respond that Woodard is qualified by his experience as a forensic pathologist for many years, including his experience in determining the cause of death where electric shock was involved over a dozen times. Plaintiffs contend Woodard's failure to consider certain Taser studies does not disqualify him because those studies were conducted by TI consultants, and thus lack independent credibility. According to Plaintiffs, Woodard relied on the facts and data upon which forensic pathologists normally rely, and he employed the standard by which medical examiners determine cause and manner of death. Plaintiffs assert that because Woodard's expertise is gained through experience, he need not have conducted scientific experiments to reach his conclusions. Finally, Plaintiffs argue that if Woodard is not qualified to testify based on his lack of specific knowledge regarding the Taser, then several of Defendant TI's experts likewise should not be permitted to testify.[2]

Plaintiffs have not met their burden of establishing Woodard's opinions are admissible, and the Court, in its discretion, will exclude Woodard's opinions. While Woodard is qualified by his experience, training, and education to be a forensic pathologist generally, Woodard has little to no knowledge, training, experience, education, or expertise related to electronic control devices generally or the Taser specifically. Woodard admitted at his deposition he does not hold himself out as an expert on Taser devices or their impact on human beings. (Woodard Dep. at 67, 121–22.) Woodard was unaware of any Taser studies conducted on humans or animals.

2. Plaintiffs' argument that if its expert is not qualified, then neither are Defendant's experts, is irrelevant. Plaintiffs bear the burden of establishing their expert is qualified regardless of the qualification of Defendant's experts.

Woodard testified, "You can't get clearance from an animal experimentation board to, you know, Taser animals to death." (*Id.* at 27; *see also id.* at 91–92 (stating he was "not aware of any research where they've applied ... Tasers to animals and measured whatever").) Although Woodard testified he read TI's experts' reports, Woodard was unfamiliar with studies that have applied the Taser to both animals and humans as mentioned therein. (App. I, Ex. 2 at App. 1, pp. 11–14, 21–23.) Despite his relative unfamiliarity with Tasers, Woodard did not educate himself on the Taser through reference materials. (Woodard Dep. at 107–08 (stating that "other than anecdotal newspaper articles on Taser associated deaths and my own experience, I was at a loss with looking up Tasers specifically").) Woodard therefore is not qualified to opine about the Taser's effects on human beings. *See Lash,* 525 F.3d at 641 (affirming district court's exclusion of proposed expert who had no experience with Tasers, Taser injuries, or the specific Taser at issue in the case).

■ Additionally, Woodard's testimony is not reliable because it is not the product of reliable principles and methods. The *Daubert* factors for determining reliability are not particularly relevant to determining the reliability of Woodard's opinions because his opinions are based largely on his experience, training, and education, not on scientific experiments he has performed. However, his opinions must have some objective medical or scientific basis to which he may apply the facts of this case.

At his deposition, Woodard admitted he has no medical or scientific basis from which to conclude the Taser in drive stun mode causes forced muscular contractions. (Woodard Dep. at 78–79.) Woodard based his conclusion on lay witness testimony that Lomax would tense his muscles during the struggle, which several witnesses

attributed to Taser discharges. (*Id.*) However, Woodard has not identified any peer reviewed study, experiment, authoritative text, or other objective source suggesting the Taser in drive stun mode results in forced muscular contractions that would interfere with compensatory hyperventilation.

Additionally, Woodard could not identify any peer reviewed study, experiment, authoritative text, or other objective source indicating Taser applications worsen metabolic derangement. (*Id.* at 91–92.) Woodard admitted he is not an expert on the question of whether the Taser causes acidosis. (*Id.* at 80.) Further, Woodard admitted he is not an expert on the level of pain a person experiences while under the influence of PCP or an expert on metabolic derangement resulting from the application of an electronic control device. (*Id.* at 86–89, 92.)

While the Court would not require Woodard to conduct his own experiments using Taser devices to support his conclusions, Woodard must have some objective basis from which to derive an opinion that the Taser causes the physiological effects Woodard ascribes to the Taser. Woodard points to no study, text, experiment or other source that the Taser in fact causes the physical responses Woodard attributes to it. When asked specifically whether he had any scientific, medical, or engineering peer-reviewed studies supporting the conclusion that the Taser caused or contributed to Lomax's death, Woodard indicated he had no such materials. (*Id.* at 117–18.) At bottom, Woodard relies upon the eyewitness testimony, but he does not link the eyewitness testimony to an objective medical or scientific source.

Absent any medical or scientific basis to support his opinion that the Taser can cause forced muscular contractions and impair compensatory hyperventilation, or

that Taser discharges worsen metabolic derangement, Woodard's opinions are not based on reliable medical or scientific methodology. Without these explanations of the mechanism by which the Taser purportedly caused Lomax's death, Woodard's primary opinion that the Taser contributed to Lomax's death has no basis beyond Woodard's unsupported opinion. The Court therefore will exclude Woodard's opinions in this matter.

### b. Strote

 Strote is a board certified, practicing emergency room physician and an assistant professor at the University of Washington Medical Center. (App. VIII, Ex. 33 at 1.) Strote has worked as an emergency room physician for four years. (*Id.*) During his residency and his emergency room work, Strote has determined the cause of death over twenty times. (Pls.' Opp'n [Doc. # 312], Ex. 10 ["Strote Dep."] at 75.) He obtained a Master of Science in neurobiology from Duke University, and his Medical Doctorate from Harvard University. (App. VIII, Ex. 33 at 1.)

Strote previously published a paper reviewing thirty-seven cases of deaths following Taser use. (*Id.*) His study obtained the autopsy reports for deaths following Taser usage where the individual died within twenty-four hours after the Taser application. (App. VIII, Ex. 33, Attach. 1 at 1–2.) Strote's study found a high incidence of preexisting cardiac disease in these individuals and concluded that "such preexisting disease, when combined with stimulant use, struggle against law enforcement, and definitive restraint maneuvers (Taser or otherwise), creates a high-risk situation for restraint-related fatalities." (*Id.* at 3.) The study's results "reinforce[ ] that the fatal encounters in which Tasers are used involve patients already at higher risk for sudden death, requiring increased EMS provider vigilance. EMS

management of patients recently subjected to application of a Taser should take into account the likelihood of the physiologic results of excited delirium and/or extensive struggle against restraint: hyperthermia, acidosis, rhabdomyolysis, and a hypersympathetic state." (*Id.*) Strote's study noted that "[b]ecause this report is a descriptive case series, causal links cannot be made. The interpretation of data is limited to establishing factors that may be associated with a risk of sudden death in the setting of Taser use." (*Id.*)

In reaching his opinion in this case, Strote reviewed witness statements, the transcript from the coroner's inquest, the medical and autopsy records, and scientific and medical literature. (App. VIII, Ex. 33 at 1.) Strote opines, to a reasonable degree of medical certainty, that Lomax went into cardiac arrest during or immediately following restraint procedures. (*Id.* at 2.) Strote opines Lomax's death resulted from multiple factors, including obesity, PCP use, the prolonged struggle, and fibrosis in his heart muscle. (*Id.*) Strote further opines that acidosis and a hypersympathetic state caused Lomax's death. (*Id.* at 3.) Strote states that the body compensates for metabolic acidosis through ventilation, but that Lomax was at a decreased ability to ventilate due to his obesity and bronchopneumonia, and his positioning on his stomach combined with an officer placing a knee in his back. (*Id.*)

Strote opines these conditions put Lomax at a high risk of cardiac arrest from metabolic derangement, a hypersympathetic state, diminished compensatory pulmonary reserve, and external restrictions on his ability to maximize his pulmonary reserve. (*Id.*) Strote asserts, "It is likely, therefore, that right before his terminal event, Mr. Lomax had almost no capacity to tolerate further insults to his heart, metabolic status, or respiratory status."

(*Id.*) According to Strote, the Taser discharges "likely furthered the metabolic derangement of Mr. Lomax, increased his hypersympathetic state, and further [ ] decreased [his] ability to compensate for these derangements." (*Id.*)

Strote opines the Taser had two effects on Lomax. First, Strote asserts that the Taser caused metabolic derangement. In support, Strote cites to a pig study that found significant acidosis in pigs after repeated Taser discharges in the probe mode. (*Id.* at 4.) Strote also opines the Taser almost certainly increased catecholamines in Lomax as a pain reaction. (*Id.*)

Second, Strote asserts the Taser may have decreased Lomax's ability to ventilate to compensate for metabolic derangement due to local contraction of accessory muscles. (*Id.*) Strote notes that although a recent study found Taser applications did not decrease ventilation, the study did not mimic real life restraint situations, and the study did not apply Taser discharges to the neck area as Lomax experienced. (*Id.*) Strote states it is possible that the drive stun mode applied to the neck area resulted in local contraction of accessory muscles, thereby decreasing Lomax's ability to "create the necessary ventilatory drive he needed to compensate for metabolic derangements." (*Id.*) Finally, Strote suggests Lomax "may also have simply tired … to the point that he no longer had the strength, physically or mentally, to continue to compensate for the other disorders in his system." (*Id.* at 5.)

In summary, Strote opines:

During the moments just prior to Mr. Lomax's terminal event, he likely was in an extremely dangerous state of increased catecholamine levels from multiple causes, metabolic acidosis from multiple causes, and a decreased ability to compensate for the effects of these factors, also from multiple causes, leading to little or no reserve to tolerate addi-

tional insult. It is therefore my opinion, within a reasonable degree of medical certainty, that given a) the temporal association of Mr. Lomax being tased multiple times, immediately ceasing to struggle, and then being found in cardiac and respiratory arrest within a very short time period and b) the effects that tasing can have on acid and catecholamine levels, exhaustion and potential breathing impairment, it is likely that the TASER application worsened Mr. Lomax's condition and decreased his ability to compensate for it, playing a critical role in his terminal event.

(*Id.* at 5.)

Defendant TI moves to strike Strote's opinions, arguing Strote lacks the necessary knowledge, training, or experience to testify about the Taser's physiological effects. Defendant also argues Strote's opinions are not based on the facts of the Lomax incident because he selectively chooses only witness statements that support his conclusions. Defendant further argues Strote did not use reliable methodology because he did not perform any experiments himself and he cannot cite to any peer-reviewed studies that support his conclusions.

Plaintiffs respond Strote has experience determining the cause of death as part of his emergency medicine work. Plaintiffs also argue Strote is qualified through his experience, his prior Taser study, and his review of other experts in various fields. Plaintiffs contend that if Strote is not qualified to opine about Tasers, then neither are several of Defendant TI's experts. Plaintiffs contend Strote's reliance on testimony that Lomax became unresponsive immediately following the last Taser discharge is supported by eyewitness testimony, and therefore is based on the facts of the case. Finally, Plaintiffs argue Strote's methodology is reliable, as he utilized his

experience and training to analyze the autopsy report, the witness statements, the inquest proceedings, and medical and scientific literature to form his opinions.

Plaintiffs have not met their burden of establishing Strote's opinions are admissible, and the Court, in its discretion, will exclude Strote's opinions. Strote's testimony is not reliable because it is not the product of reliable principles and methods. The *Daubert* factors for determining reliability are not particularly relevant to determining the reliability of Strote's opinions because his opinions are based largely on his experience, training, education, and review of medical and scientific literature, not on scientific experiments he has performed. However, Strote's opinions must have some objective medical or scientific basis to which he may apply the facts of this case.

At his deposition, Strote could not identify any study or experiment regarding the Taser's effects on the human body when applied in the drive stun mode. (Strote Dep. at 112.) Strote also could not identify any objective source finding that the Taser applied in the drive stun mode can kill an adult human being. (*Id.* at 173.) Strote admitted no medical or scientific literature has established a link between a Taser application and fatal injury. (App. XV, Ex. 78 at 46.)

Further, although Strote opines the Taser applications made Lomax more acidotic and increased his hypersympathetic state, Strote could not state how much more acidotic Lomax became due to Taser applications, or how much the Taser increased his hypersympathetic state. (Strote Dep. at 154–56.) Moreover, Strote could not identify any peer-reviewed studies or papers supporting his opinion that the Taser in drive stun mode would have made Lomax more acidotic, increased his hypersympathetic state, or impacted his accessory muscles. (*Id.* at 154–56, 164.)

Strote also could not cite to any peer-reviewed studies or papers supporting his opinion that Taser applications in drive stun mode decrease a person's ability to keep up with ventilatory compensation. (*Id.* at 160.) Additionally, Strote admitted he did not know how much of an increase in catecholamines a person would experience from a Taser application in drive stun mode, stating, "I don't have the scientific data to back it up. But clinically it makes sense to me." (*Id.* at 191.) Finally, Strote could not state to a reasonable degree of medical certainty that Lomax would have lived absent the Taser discharges. (*Id.* at 203–04.)

While the Court would not require Strote to conduct his own experiments using Taser devices to support his conclusions, Strote must have some objective basis from which to derive an opinion that the Taser causes the physiological effects Strote ascribes to the Taser. Strote lacks any objective medical source linking the eyewitness testimony and his opinions as to what caused Lomax's death. Absent any medical or scientific basis to support his opinion that the Taser in drive stun mode increases acidosis, increases a person's hypersympathetic state, impacts the accessory muscles, or increases catecholamine levels in a person on PCP, Strote's opinions are not based on reliable medical or scientific methodology. *See Cabrera v. Cordis Corp.,* 945 F.Supp. 209 (D.Nev. 1996), *affirmed by* 134 F.3d 1418 (1998). The Court therefore will exclude Strote's opinions in this matter.

Plaintiffs have failed to produce any admissible evidence stating to a reasonable degree of medical certainty that the Taser caused or contributed to Lomax's death. Plaintiffs therefore have not raised a genuine issue of material fact as to causation, and the Court will grant Defendant TI's motion for summary judgment.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendant Taser International, Inc.'s Motion for Summary Judgment (Doc. # 248) is hereby GRANTED. Judgment is hereby entered in favor of Defendant Taser International, Inc. and against Plaintiffs.

IT IS FURTHER ORDERED that Plaintiffs' Daubert Motion to Exclude Testimony of Defendants' Expert Witnesses (Doc. # 260) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion to Exclude the Testimony of Plaintiffs' Purported Expert, Mark Rhodes (Doc. # 263) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion to Exclude the Testimony of Plaintiffs' Purported Expert, Brett H. Woodard, M.D. (Doc. # 267) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion to Limit Testimony of Plaintiffs' Disclosed Expert, Dr. Knoblock (Doc. # 268) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion to Limit Testimony of Plaintiffs' Retained Expert, Dr. Strote (Doc. # 269) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion to Exclude the Testimony of Plaintiffs' Purported Expert, Jerry Bush (Doc. # 270) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Joinder in Las Vegas Metropolitan Police Department's Motion to Exclude the Testimony of Plaintiffs' Purported Expert, David M. Ingebretsen (Doc. # 271) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion and Supporting Memorandum to Exclude Tendered Expert Ron Martinelli (Doc. # 272) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Taser International, Inc.'s Motion to Exclude the Testimony of Plaintiffs' Purported Expert, Terence M. Clauretie, Ph.D. (Doc. # 273) is hereby DENIED as moot.