ANDREW MORSICATO and CONCETTA MORSICATO, HUS-BAND AND WIFE, APPELLANTS, v. SAV-ON DRUG STORES, INC., A DELAWARE CORPORATION, RESPONDENT.

No. 41879

May 26, 2005                                              111 P.3d 1112

[Rehearing denied August 3, 2005]

[En banc reconsideration denied September 8, 2005]

[23]*Id.*; *see also O'Lane,* 110 Nev. at 501, 874 P.2d at 757.

*Harrison Kemp & Jones, LLP,* and *Artemus W. Ham IV* and *J. Randall Jones,* Las Vegas, for Appellants.

*Beckley Singleton, Chtd.,* and *Joel D. Henriod* and *Daniel F. Polsenberg,* Las Vegas, for Respondent.

Before ROSE, GIBBONS and HARDESTY, JJ.

# OPINION

*Per Curiam:*

Andrew Morsicato and Concetta Morsicato appeal from a final judgment of the district court, following a jury verdict, of no liability in a pharmacy malpractice action. The Morsicatos challenge the district court's admission of expert testimony that failed to conform to the reasonable degree of medical probability standard. We take this opportunity to clarify our holding in *Banks v. Sunrise Hospital*[1] and confirm that medical expert testimony on the issue of causation must be stated to a reasonable degree of medical probability. Because, in this case, the testimony did not conform to this standard, we reverse the district court's judgment.

## FACTS

After suffering rash-like symptoms, Andrew Morsicato was diagnosed with scabies. His dermatologist prescribed lindane lotion, an extremely potent neurotoxin lotion used as an insecticide to treat scabies. The dermatologist wrote two prescriptions for the lotion, one for Mr. Morsicato and one for his wife, as scabies is highly contagious to members of the same household.

Morsicato presented both prescriptions to Sav-On Drug Stores for filling and received two bottles of lindane, each with different application instructions. Morsicato's prescription correctly indicated the lotion should be applied at bedtime and washed off after 12 hours. The label on his wife's prescription displayed flawed instructions, directing application of the lotion every 12 hours. Sav-On's pharmacy expert admitted that Sav-On improperly labeled the wife's prescription bottle by directing lindane application every 12 hours.

Morsicato used his wife's prescription, applying the lotion every 12 hours for several days. Following multiple applications of the lotion, Morsicato began experiencing pain and significant skin irritation. Morsicato returned to his primary treating physician with boils, blisters, redness, and extreme pain on those areas where he had applied the lotion. Several physicians evaluated Morsicato and concluded that his injuries were linked to overexposure to lindane.

The Morsicatos sued Sav-On claiming that multiple applications of lindane caused Morsicato's permanent injuries. Because Sav-On admitted to improperly labeling the bottle, the district court granted a directed verdict in favor of the Morsicatos on the issue of

---

[1]120 Nev. 822, 834-35, 102 P.3d 52, 60-61 (2004).

Sav-On's negligence. The issues of causation, comparative negligence, and damages remained for the jury.

Prior to jury selection, the district court informed all parties that it was using a lottery system to select alternate jurors. In the lottery system, a total of ten jurors were seated in the jury box for the trial, and after closing argument but before deliberation, two alternate jurors were chosen by random drawing. Under this selection process, any two of the ten jurors could have been selected to be the alternate jurors. The record reveals the Morsicatos' counsel acquiesced in the district court's suggested process.

During trial, the jurors considered causation evidence. The Morsicatos presented several experts, who testified to a reasonable degree of medical probability that Morsicato's injuries were caused by the lindane lotion. Sav-On offered only the testimony of a neurologist, Dr. Michael Schneck. Dr. Schneck acknowledged the theory that lindane exposure caused Morsicato's injuries, but he opined that other theories, including an autoimmune response, could explain the injury. After counsel objected to the speculative nature of Dr. Schneck's testimony, the court explained that medical opinions regarding causation must state that the particular form of causation was more likely than not, or more than 50 percent likely. Dr. Schneck then testified that his autoimmune theory was not more likely than other causes but that he would rank that theory as the most likely medical cause. Dr. Schneck acknowledged that his ranking of possible causes was inconsistent with Nevada's evidentiary standard. Again, the court explained the standard, clarifying that the opinion must be more than 50 percent likely or the court would strike the testimony. Dr. Schneck then stated that the autoimmune phenomenon was the most likely cause.

The jury returned a unanimous verdict, finding that Sav-On's negligence did not cause Morsicato's skin condition. The judgment was then entered based on this verdict. The Morsicatos filed a motion for new trial and a motion for judgment notwithstanding the verdict (JNOV), which the district court denied in a subsequent order.[2]

---

[2]The Morsicatos raise on appeal the denial of these motions. The order denying the JNOV is not appealable; therefore, we do not address it now. *Krause Inc. v. Little,* 117 Nev. 929, 933, 34 P.3d 566, 569 (2001). The Morsicatos also argue that a new trial is warranted, given the use of a lottery selection system to select alternate jurors. The Morsicatos' counsel, however, acquiesced to the process used in this trial, and nothing precludes counsel from stipulating to the use of a lottery system for selecting alternate jurors. Further, even if counsel had not acquiesced, so that the lottery system violated NRCP 47(b), we would conclude that any failure to follow NRCP 47(b) did not result in prejudice that would warrant a new trial. *City of Elko v. Zillich,* 100 Nev. 366, 371, 683 P.2d 5, 8 (1984).

## DISCUSSION

*Admissibility of expert testimony*

The Morsicatos argue Dr. Schneck's expert testimony on causation was speculation and conjecture that failed to meet the requisite standard for expert testimony and therefore should have been stricken. We agree.

A district court's decision to admit expert testimony is reviewed for an abuse of discretion.[3] The district court's decision will not be overturned absent "a clear abuse of discretion."[4]

NRS 50.275 provides that "a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge." In *United Exposition Service Co. v. SIIS,* we concluded that an "award of compensation cannot be based solely upon possibilities and speculative testimony."[5] In that case, which involved the payment of workers' compensation benefits after an industrial injury, we held that "physician[s] must state to a degree of reasonable medical probability that the condition in question was caused by the industrial injury, or sufficient facts must be shown so that the trier of fact can make the reasonable conclusion that the condition was caused by the industrial injury."[6] The speculative nature of an opinion that an injury possibly could have been a precipitating factor was insufficient to support a finding of causation; specifically, we stated, "A possibility is not the same as a probability."[7]

Sav-On argues that even though Dr. Schneck's testimony was not made to a reasonable degree of medical probability, it was nevertheless admissible under the general standard of NRS 50.275 because it did not address an ultimate finding of fact.

Not all medical expert testimony must be stated with a reasonable degree of medical probability. The standard for admissibility varies depending upon the expert opinion's nature and purpose.

In *Banks v. Sunrise Hospital,* this court considered the contention that the district court erred in admitting expert medical opinion testimony.[8] During trial, the medical expert testified re-

---

[3]*Krause,* 117 Nev. at 933-34, 34 P.3d at 569.

[4]*Id.* at 934, 34 P.3d at 569.

[5]109 Nev. 421, 424, 851 P.2d 423, 425 (1993).

[6]*Id.* at 424-25, 851 P.2d at 425.

[7]*Id.* at 425, 851 P.2d at 425.

[8]120 Nev. 822, 834-35, 102 P.3d 52, 60-61 (2004).

garding possible ways anesthesia equipment could fail and admitted that, because he could not examine the actual machine used, he could not determine whether the equipment contributed to the victim's injury.[9] Although the expert opinion testimony was based on less than a reasonable degree of medical probability, we concluded that the district court did not abuse its discretion in admitting the evidence.[10] The medical opinion testimony related to the operation of equipment and not to any medical standard of care. However, the holding in *Banks* was not intended to modify or change in any way the requirement that medical expert testimony, regarding the standard of care and causation in a medical malpractice case, must be based on testimony made to a reasonable degree of medical probability.

Since 1989, this court has held that "a medical expert is expected to testify only to matters that conform to the reasonable degree of medical probability standard."[11] Furthermore, in dictum, this court has observed that expert testimony regarding causation must also rise to this level of certainty.[12] As the Pennsylvania Supreme Court has recognized, one rationale for requiring such specificity with expert opinions is that "if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."[13]

We conclude that medical expert testimony regarding standard of care and causation must be stated to a reasonable degree of medical probability. In this case, Dr. Schneck testified concerning an ultimate issue in the case, causation. He was not certain what caused Morsicato's injuries; however, he stated that he could offer a theory that was just as plausible as the theory that lindane caused the injury. He further testified that he ranked an autoimmune response as the most likely cause of the injury and recognized that this was inconsistent with Nevada's evidentiary standard. Only

---

[9]*Id.* at 835, 102 P.3d at 61.

[10]*Id.*

[11]*Brown v. Capanna,* 105 Nev. 665, 671-72, 782 P.2d 1299, 1304 (1989).

[12]*See, e.g., id.* at 671-72, 782 P.2d at 1304 (recognizing that testimony regarding causation must conform to the reasonable degree of medical probability standard); *accord Fitzgerald v. Manning,* 679 F.2d 341, 350 (4th Cir. 1982) (in order to qualify on causation, the medical expert opinion cannot be stated in general terms but must be stated in terms of a reasonable degree of medical certainty).

[13]*McMahon v. Young,* 276 A.2d 534, 535 (Pa. 1971).

after the court explained that Dr. Schneck's testimony would be stricken unless he testified in accordance with Nevada law, did he state that more likely than not an autoimmune response was the most likely cause of the injuries. Dr. Schneck never stated his medical opinion to a reasonable degree of medical probability, however.

Dr. Schneck's testimony was highly speculative and failed to meet the admissibility standard. Therefore, we conclude that the district court abused its discretion in failing to strike the testimony, and we reverse the district court's judgment and remand for a new trial on the issues of causation, contributory negligence, and damages, if any.