JAMES M. WILLIAMS AND HEIDI WILLIAMS, HUSBAND AND WIFE; AND JOANNE ALLEN AND KENNETH G. ALLEN, HUSBAND AND WIFE, PETITIONERS, *v.* THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK; AND THE HONORABLE KATHLEEN E. DELANEY, DISTRICT JUDGE, RESPONDENTS, AND BAXTER HEALTHCARE CORPORATION; SICOR, INC.; TEVA PARENTERAL MEDICINES, INC., FKA SICOR PHARMACEUTICALS, INC.; AND McKESSON MEDICAL-SURGICAL, INC., REAL PARTIES IN INTEREST.

No. 56928

SICOR, INC.; TEVA PARENTERAL MEDICINES, INC. (FKA SICOR PHARMACEUTICALS, INC.); McKESSON MEDICAL-SURGICAL, INC.; AND BAXTER HEALTHCARE CORPORATION, PETITIONERS, *v.* THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK; AND THE HONORABLE TIMOTHY C. WILLIAMS, DISTRICT JUDGE, RESPONDENTS, AND MARIA V. PAGAN, INDIVIDUALLY; AND WILLIAM I. BILGER, JR., AND MARILYN ELAINE BILGER, HUSBAND AND WIFE, REAL PARTIES IN INTEREST.

No. 57079

July 28, 2011                                           262 P.3d 360

*Mainor Eglet* and *Robert T. Eglet*, Las Vegas; *Kemp Jones & Coulthard LLP* and *Will Kemp*, Las Vegas, for James M. Williams;

Heidi Williams; Joanne Allen; Kenneth G. Allen; Maria V. Pagan; William I. Bilger, Jr.; and Marilyn Elaine Bilger.

*Lewis & Roca LLP* and *Daniel F. Polsenberg*, Las Vegas; *Olson, Cannon, Gormley & Desruisseaux* and *James R. Olson, Michael E. Stoberski*, and *Max E. Corrick II*, Las Vegas; *Alan M. Dershowitz*, Cambridge, Massachusetts, for Baxter Healthcare Corporation; McKesson Medical-Surgical, Inc.; Sicor, Inc.; and Teva Parenteral Medicines, Inc.

Before the Court EN BANC.[1]

## OPINION

By the Court, HARDESTY, J.:

These consolidated writ petitions raise two novel issues involving the admissibility of expert testimony: (1) whether a nurse can testify as an expert regarding medical causation, and (2) whether defense expert testimony offering alternative causation theories must meet the "reasonable degree of medical probability" standard set forth in *Morsicato v. Sav-On Drug Stores, Inc.*, 121 Nev. 153, 155, 111 P.3d 1112, 1114 (2005). We conclude that a nurse can testify regarding matters within his or her specialized area of practice, but not as to medical causation unless he or she has obtained the requisite knowledge, skill, experience, or training to identify cause. We further take this opportunity to clarify the standard for defense expert testimony regarding medical causation and conclude that the standard differs depending on how the defendant utilizes the expert's testimony. When a defense expert traverses the causation theory offered by the plaintiff and purports to establish an independent causation theory, the testimony must be stated to a reasonable degree of medical probability pursuant to *Morsicato*. However, when a defense expert's testimony of alternative causation theories controverts an element of the plaintiff's prima facie case where the plaintiff bears the burden of proof, the testimony need not be stated to a reasonable degree of medical proba-

---

[1]THE HONORABLE KRISTINA PICKERING, Justice, and THE HONORABLE RON PARRAGUIRRE, Justice, voluntarily recused themselves from participation in the decision of this matter.

bility, but it must be relevant and supported by competent medical research.

Here, in Docket No. 56928, we conclude that the district court abused its discretion when it allowed an unqualified nurse to offer expert testimony regarding medical causation; however, it did not abuse its discretion when it determined that one of the defense's other expert witnesses could offer testimony regarding alternative causation theories. In Docket No. 57079, we conclude that the district court abused its discretion when it precluded the same nurse from offering any expert testimony because a nurse can testify within his or her area of expertise but not as to causation, unless he or she possesses the requisite knowledge, skill, experience, or training to identify cause.[2] Therefore, writ relief is granted in part and denied in part.

## FACTS

These writ petitions arise out of two separate actions resulting from an outbreak of hepatitis C at the Endoscopy Clinic of Southern Nevada (ECSN) in Las Vegas. The defendants in the district court are companies involved in the pharmaceutical industry that are being sued by former patients who were allegedly infected with hepatitis C while having procedures performed at ECSN and their spouses.

In each case below, the plaintiffs are suing the defendants for strict products liability, including design defect, failure to warn, and breach of implied warranty of fitness for a particular purpose. The plaintiffs[3] theorize that defective vials of the anesthetic Propofol caused them to contract hepatitis C. They claim that defendants Baxter Healthcare Corporation; Sicor, Inc.; Teva Parenteral Medicines, Inc., f.k.a. Sicor Pharmaceuticals, Inc.; and McKesson Medical-Surgical, Inc. (collectively, Sicor), are liable for their distribution of 50mL vials of Propofol to endoscopy clinics because that size vial lends itself to reuse and contamination. More specifically, the plaintiffs allege that medical personnel at ECSN injected needles contaminated with hepatitis into vials of Propofol. The medical personnel then allegedly reused those vials and injected the plaintiffs with the now-contaminated Propofol.

---

[2]The district court in Docket No. 57079 did not address the admissibility of Dr. Cohen's testimony regarding causation.

[3]In Docket No. 56928, the plaintiffs in the lower court and petitioners here are James M. and Heidi Williams, and Joanne and Kenneth G. Allen. Heidi and Kenneth are suing in their capacity as spouses of James and Joanne, who underwent procedures at ECSN. We collectively refer to them as the Williams Petitioners. In Docket No. 57079, the plaintiffs in the lower court and the real parties in interest here are Maria Pagan and William I. and Marilyn Elaine Bilger. Marilyn is suing in her capacity as William's spouse. We collectively refer to them as the Pagan Parties.

To rebut these claims, Sicor obtained opinions from several experts, including the two who are at issue in this appeal: David Hambrick, a registered nurse, and Jonathan Cohen, M.D., a professor of medicine. In both cases, these experts opined that improper cleaning and disinfection techniques at the clinic may have caused the plaintiffs to contract hepatitis C, but they could not identify a specific piece of equipment that transmitted the virus. The Williams Petitioners refer to this theory as the "dirty scopes" theory. Based on those opinions, the plaintiffs in each case filed motions in limine to exclude Nurse Hambrick's and Dr. Cohen's testimony. However, the district courts hearing these two cases came to different conclusions concerning Nurse Hambrick.

## Docket No. 56928

The Williams Petitioners filed two motions in limine to exclude expert testimony. In the first motion, the Williams Petitioners asked the district court to preclude Sicor from offering testimony that "dirty scopes" caused their hepatitis C because Dr. Cohen and Nurse Hambrick "did *not* have an opinion to a reasonable degree of medical probability that a 'dirty scope' was the cause of hepatitis . . . ." In the second motion, the Williams Petitioners similarly asked the district court to preclude the defendants from offering testimony regarding a "dirty scope" alternative theory of causation, and they also argued that nurses cannot give testimony regarding causation. At the hearing on the motions, the Williams Petitioners again argued that Nurse Hambrick could not qualify as an expert.

The district court denied both motions for two reasons. First, the court noted that "NRS 632.019 does not preclude a nurse from providing expert testimony."[4] The district court cited *Staccato v. Valley Hospital*, 123 Nev. 526, 531-32 n.13, 170 P.3d 503, 506 n.13 (2007), for the proposition that assessing a nurse as an expert requires an evaluation of his or her skill and knowledge and that this court has determined that nurses can testify against doctors. The district court further found that Nurse Hambrick was well-qualified and met the standard set forth in *Morsicato*, 121 Nev. 153, 111 P.3d 1112, for expert testimony. The district court next determined that Sicor would "be able to offer competent evidence and expert testimony regarding [its breach of infection control practices] theory of medical causation."

## Docket No. 57079

The Pagan Parties filed a similar motion in limine to exclude testimony regarding a "dirty scope" theory. Unlike in the Williams

---

[4]NRS 632.019 is the statutory definition of "[r]egistered nurse."

Petitioners' case, the district court granted the Pagan Parties' motion to exclude Nurse Hambrick from offering his opinion that unsafe cleaning practices caused the plaintiffs to contract hepatitis C. The district court found that Nurse Hambrick's opinion was related to a specific alternative causation theory and, therefore, had to meet the reasonable degree of medical probability standard announced in *Morsicato*. Applying this standard, the district court determined that, based on Nurse Hambrick's deposition testimony, he could not testify to greater than a 10-percent probability that the cleaning processes used caused the plaintiffs' hepatitis, and *Morsicato* requires greater than 50 percent. The district court also found that, pursuant to *Morsicato*, an "expert can not simultaneously testify as to 2 different medical causation opinions," and, here, Nurse Hambrick could not identify a specific piece of equipment as the cause of the plaintiffs' hepatitis C.

After the district courts entered their respective orders regarding Sicor's expert witnesses, the aggrieved parties (the Williams Petitioners in their case and Sicor in the Pagan Parties' matter) petitioned this court for extraordinary writ relief. On October 14 and November 4, 2010, this court granted temporary stay orders in the underlying matters pending the resolution of the writ petitions. The November 4 order also consolidated these two original writ proceedings.

## DISCUSSION

*When a writ of mandamus is appropriate*

"A writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station or to control an arbitrary or capricious exercise of discretion." *International Game Tech. v. Dist. Ct.*, 124 Nev. 193, 197, 179 P.3d 556, 558 (2008) (footnote omitted); NRS 34.160. This court has held that the decision to admit or exclude expert opinion testimony is discretionary and is not typically subject to review on a petition for a writ of mandamus. *Walton v. District Court*, 94 Nev. 690, 693, 586 P.2d 309, 311 (1978). Mandamus is also not available when the "petitioner has a plain, speedy, and adequate remedy in the ordinary course of law," *Mineral County v. State, Dep't of Conserv.*, 117 Nev. 235, 243, 20 P.3d 800, 805 (2001), and the opportunity to appeal a final judgment typically provides an adequate legal remedy, *see Walton*, 94 Nev. at 693, 586 P.2d at 310.

Despite these limitations, we recognize some narrow exceptions when writ relief is appropriate concerning challenges to decisions that admit or exclude evidence. We acknowledge that the ability to

appeal a final judgment may not always constitute an adequate and speedy remedy that precludes writ relief, depending on the "underlying proceedings' status, the types of issues raised in the writ petition, and whether a future appeal will permit this court to meaningfully review the issues presented." *D.R. Horton v. Dist. Ct.*, 123 Nev. 468, 474-75, 168 P.3d 731, 736 (2007). Thus, we may consider writ petitions challenging the admission or exclusion of evidence when " 'an important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction,' " *Sonia F. v. Dist. Ct.*, 125 Nev. 495, 498, 215 P.3d 705, 707 (2009) (quoting *Mineral County*, 117 Nev. at 243, 20 P.3d at 805), or when the issue is "one of first impression and of fundamental public importance," *County of Clark v. Upchurch*, 114 Nev. 749, 753, 961 P.2d 754, 757 (1998). We may also consider whether resolution of the writ petition will mitigate or resolve related or future litigation. *Id.* Ultimately, however, our analysis turns on the promotion of judicial economy. *Smith v. District Court*, 113 Nev. 1343, 1345, 950 P.2d 280, 281 (1997) ("The interests of judicial economy . . . will remain the primary standard by which this court exercises its discretion.").

We conclude that an exception to our normal rule rejecting writ petitions challenging evidentiary rulings is necessary in this matter, and we exercise our discretion to consider these writ petitions. These petitions involve issues of first impression regarding whether a nurse can offer expert testimony about medical causation and the appropriate standard for defense expert testimony regarding alternative theories of medical causation, and these issues have the potential of being repeated in the many endoscopy cases pending before the district court. We also conclude that, in this narrow instance, waiting for an appeal to resolve these issues does not provide the parties with an adequate or speedy remedy because the ongoing litigation of multiple cases in the district court and conflicts in evidentiary rulings limits our ability to meaningfully review the issues on appeal. We reemphasize, however, that generally this court will not consider writ petitions challenging evidentiary rulings, as those rulings are discretionary and there typically is an adequate remedy in the form of an appeal following an adverse final judgment. However, in the interest of judicial economy, it is necessary to resolve the issues presented in these writs.

*Standard of review*

In the context of a writ petition, this court gives deference to the district court's findings of fact, but reviews questions of law de novo. *Gonski v. Dist. Ct.*, 126 Nev. 551, 557, 245 P.3d 1164,

1168 (2010). The issues raised in these petitions are questions of law.

*Admissibility of Nurse Hambrick's and Dr. Cohen's testimony*

An "expert witness assessment turns on whether the proposed witness's special knowledge, skill, experience, training, or education will assist the jury." *Staccato*, 123 Nev. at 531, 170 P.3d at 506; *see also* NRS 50.275 (witnesses who possess the requisite "knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge"). Before a witness may testify as an expert under NRS 50.275, the district court must first determine his or her qualifications, including whether

> (1) he or she [is] qualified in an area of "scientific, technical or other specialized knowledge" (the qualification requirement); (2) his or her specialized knowledge must "assist the trier of fact to understand the evidence or to determine a fact in issue" (the assistance requirement); and (3) his or her testimony must be limited "to matters within the scope of [his or her specialized] knowledge" (the limited scope requirement).

*Hallmark v. Eldridge*, 124 Nev. 492, 498, 189 P.3d 646, 650 (2008) (quoting NRS 50.275). In their petition and accompanying supplement, the Williams Petitioners challenge the qualification requirement and the assistance requirement as to Nurse Hambrick, and the assistance requirement as to Dr. Cohen.

> *Nurse Hambrick is not qualified to testify as to medical causation*

The Williams Petitioners and the Pagan Parties make two arguments regarding Nurse Hambrick's qualifications to testify as to medical causation. First, they argue that nurses can never testify as to medical causation because NRS 632.019 defines "[r]egistered nurse" as "a person who is licensed to practice professional nursing," and NRS 632.018 provides that professional nursing "does not include acts of medical diagnosis." Thus, they argue, nurses are not qualified to render expert opinions regarding causation. They ask us to adopt what they characterize as a "near universal rule that a *nurse* can not play doctor and give medical causation testimony." Second, they challenge whether Nurse Hambrick possesses the requisite skill, knowledge, experience, training, or education to testify to the cause of the hepatitis C transmission that occurred at ECSN. We disagree that nurses are per se precluded from testifying as to medical causation, but we agree that Nurse Hambrick did not meet the requirements to testify as an expert regarding medical causation here.

In *Staccato*, we recognized that "in accordance with Nevada's statutory scheme governing expert witness testimony, and in furtherance of sound public policy, the proper measure for evaluating whether a witness can testify as an expert is whether that witness possesses the skill, knowledge, or experience necessary to [testify]." 123 Nev. at 527, 170 P.3d at 504; *see also Hallmark*, 124 Nev. at 499, 189 P.3d at 650 (holding that a witness may testify as an expert if "he or she is qualified in an area of scientific, technical, or other specialized knowledge"). This court has recognized the following nonexhaustive factors in assessing whether an expert witness is appropriately qualified: "(1) formal schooling and academic degrees, (2) licensure, (3) employment experience, and (4) practical experience and specialized training." *Hallmark*, 124 Nev. at 499, 189 P.3d at 650-51 (internal footnotes omitted). However, we have consistently rejected the notion that any rigid guidelines can govern this analysis, and district courts have "wide discretion, within the parameters of NRS 50.275, to fulfill their gatekeeping duties" to evaluate the admissibility of expert testimony.[5] *Higgs v. State*, 126 Nev. 1, 17, 222 P.3d 648, 658 (2010); *see also Staccato*, 123 Nev. at 530, 170 P.3d at 505.

In some circumstances, a nurse may obtain the requisite skill, knowledge, or experience to testify as to cause. *See Maloney v. Wake Hospital Systems, Inc.*, 262 S.E.2d 680, 684 (N.C. Ct. App. 1980) (excluding nurse's testimony as to cause was in error because

---

[5]We recognize that some jurisdictions have adopted bright-line standards holding that, while nurses are qualified to give opinions related to standard of care, they are not similarly qualified to make medical diagnoses or opine as to medical causation. *See Phillips v. Alamed Co., Inc.*, 588 So. 2d 463, 465 (Ala. 1991) ("[W]e cannot say that the trial judge abused his discretion by requiring the testimony of a physician and, implicitly, holding that a registered nurse was not competent to testify as an expert on the issue of proximate cause."); *Vaughn v. Miss. Baptist Med. Center*, 20 So. 3d 645, 652 (Miss. 2009) ("[N]ursing experts cannot opine as to medical causation and are unable to establish the necessary element of proximate cause."); *Kent v. Pioneer Valley Hosp.*, 930 P.2d 904, 907 (Utah Ct. App. 1997) ("Although a nurse may well be trained in the proper location to administer injections, we are not persuaded that a nurse is qualified to opine as to nerve damage caused by an allegedly improper injection."). Other courts that have not allowed nurses to testify have noted that causation is a legal question separate from the question of the appropriate standard of care, which can be within a nurse's area of expertise. *See Elswick v. Nichols*, 144 F. Supp. 2d 758, 767 (E.D. Ky. 2001); *Colwell v. Holy Family Hosp.*, 15 P.3d 210, 213-14 (Wash. Ct. App. 2001). Still other courts have examined statutory restrictions on the practice of nursing and concluded that those restrictions preclude nurses from testifying as to medical causation. *See Flanagan v. Labe*, 666 A.2d 333, 337-38 (Pa. Super. Ct. 1995) (holding that because a Pennsylvania statute did not permit nurses to make medical diagnoses, they were not qualified to opine as to medical causation). However, we decline to follow these authorities.

"nurses and other physicians' assistants play a much greater role in the actual diagnosis and treatment of human ailments than previously"); *Longuy v. La Societe Francaise De Bienfaisance Mutuelle*, 198 P. 1011, 1014 (Cal. Ct. App. 1921) ("[T]estimony [regarding cause of death] sought to be elicited from the professional nurses who were familiar with the baby's condition became very material and should have been admitted."). Thus, the relevant inquiry does not end with a reading of a statute defining the practice of professional nursing; rather, it depends upon a case-by-case examination of a nurse's actual skill, knowledge, experience, or training that is gained through practicing his or her profession.[6]

Nurse Hambrick has extensive experience in cleaning and disinfecting the type of equipment used during an endoscopy procedure. He is a registered nurse in Texas, has been certified in gastroenterology for ten years, and he is currently the manager of the gastroenterology lab at the Methodist Dallas Medical Center. He has also been published in a peer-reviewed journal regarding biopsy and tissue acquisition equipment, has written and spoken extensively on the topic of infection control, and has trained over 75 people on proper disinfection techniques. Additionally, he served as director of the national board of directors for the Society of Gastroenterology Nurses and Associates. Nurse Hambrick's educational experience includes a two-year nursing degree, and he was due to complete a bachelor of science in nursing in December 2010. Both the Williams Petitioners and the Pagan Parties argue that these facts do not make Nurse Hambrick qualified to testify as an expert because he does not a have a four-year college degree, and his experience with endoscopy equipment cleaning and disinfectant techniques is insufficient to qualify him to give medical causation opinions. The Williams Petitioners also argue that Nurse Hambrick's lack of knowledge about the hepatitis C virus demonstrates that he is unqualified as a medical expert.

Despite his experience with endoscopy equipment and disinfectant techniques, Nurse Hambrick has little, if any, experience in diagnosing the cause of hepatitis C. Nurse Hambrick never indicated, and Sicor did not contend, that Nurse Hambrick ever made medical diagnoses to assess cause. In fact, Nurse Hambrick noted that in his previous nursing positions, doctors, not nurses, always determined the cause of illnesses indicated on a patient's chart. Also, by Sicor's own admission, Nurse Hambrick is only a leading expert on "endoscopic reprocessing" and "the standards gov-

---

[6]Just as a licensed professional may gain experience beyond the scope of his or her license, *see Staccato v. Valley Hospital*, 123 Nev. 526, 530, 170 P.3d 503, 505 (2007), a nurse may similarly acquire skill, knowledge, experience, or training outside the scope of the statutory definition of that occupation. Thus, the district court must evaluate an individual nurse's qualifications when deciding whether to admit or exclude expert testimony.

erning and proper means of disinfecting gastrointestinal endoscopy equipment." This does not, by extension, qualify him to testify regarding medical causation. We thus conclude that, while Nurse Hambrick may be more than qualified to testify as to proper cleaning and sterilization procedures for endoscopic equipment and can testify on those subjects, he does not possess the requisite skill, knowledge, or experience to testify as an expert witness regarding the medical cause of hepatitis C transmission at ECSN.[7]

*Dr. Cohen will assist the trier of fact*

To assist the trier of fact, medical expert testimony regarding causation must be "made to a reasonable degree of medical probability." *Morsicato v. Sav-On Drug Stores, Inc.*, 121 Nev. 153, 157, 111 P.3d 1112, 1115 (2005); *see also Hallmark*, 124 Nev. at 500, 189 P.3d at 651 ("If a person is qualified to testify as an expert under NRS 50.275, the district court must then determine whether his or her expected testimony will assist the trier of fact in understanding the evidence or determining a fact in issue."). Such specificity is required because " 'if the . . . medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment.' " *Morsicato*, 121 Nev. at 158, 111 P.3d at 1116 (quoting *McMahon v. Young*, 276 A.2d 534, 535 (Pa. 1971)). The Williams Petitioners, the Pagan Parties, and Sicor disagree on the meaning of "reasonable degree of medical probability" when that term is used in the context of defense experts who offer alternative causation theories to controvert the plaintiff's prima facie case. Therefore, we clarify the standard and conclude that when defense expert testimony regarding cause is offered as an alternative to the plaintiff's theory, it will assist the trier of fact if it is relevant and supported by competent medical research.

Sicor argues that, in light of the plaintiff's burden of proving causation in a products liability action, *Rivera v. Philip Morris, Inc.*, 125 Nev. 185, 191, 209 P.3d 271, 275 (2009), the reasonable degree of medical probability standard applies only to the plaintiff's expert's testimony regarding cause. However, the standard exists to ensure the competence and quality of testimony establishing causation, and whether it applies is not determined by the party who offers it. *Stinson v. England*, 633 N.E.2d 532, 537 (Ohio 1994) ("Inasmuch as the expression of probability is a condition

---

[7]Because we conclude that Nurse Hambrick is not qualified to offer testimony regarding medical causation, we do not analyze the assistance requirement as it pertains to him.

precedent to the admissibility of expert opinion regarding causation, it relates to the competence of such evidence and not its weight. Accordingly, it is essential to focus on the quality of the evidence adduced regardless of the identity of its proponent.''). Rather, the relevant inquiry in determining whether the reasonable degree of medical probability standard applies is the purpose of the testimony. Any expert testimony introduced for the purpose of establishing causation must be stated to a reasonable degree of medical probability. However, defense experts may offer opinions concerning causation that either contradict the plaintiff's expert or furnish reasonable alternative causes to that offered by the plaintiff.

Once the plaintiff has demonstrated a prima facie case and met his or her burden, the defendant can traverse the plaintiff's case in three ways. *See id.* The defendant may (1) cross-examine the plaintiff's expert, (2) contradict the expert's testimony with his own expert, and/or (3) propose an independent alternative causation theory. *Id.* If the defendant chooses the third approach, his or her expert's testimony is subject to the reasonable degree of medical probability standard because, in order to assist the trier of fact, testimony establishing cause must meet a heightened threshold requirement. *Id.* at 538; *see also Goudreault v. Kleeman*, 965 A.2d 1040, 1058 (N.H. 2009) (holding that a lowered standard only applies when the defense expert is rebutting the plaintiff's causation theory). In instances where the expert is expressing an opinion as to causation, it is irrelevant whether the testimony is offered by the plaintiff or the defendant.

However, if the defense expert's testimony is used for the purpose of cross-examining the plaintiff's expert or to otherwise contradict the plaintiff's causation theory by comparing that theory to other plausible causes, the defense expert does not need to state each additional cause to a greater-than-50-percent probability.[8] *Stinson*, 633 N.E.2d at 538. Because the defense expert in this instance is controverting a key element of the plaintiff's prima facie case, as long as his or her alternative causation theory or theories are competent and supported by relevant evidence or research, they

---

[8]By definition, probability requires more than 50-percent likelihood. *Stinson v. England*, 633 N.E.2d 532, 536 (Ohio 1994) (''[P]robability means more than a fifty percent likelihood.''); *see also Morsicato*, 121 Nev. at 159, 111 P.3d at 1116 (reversing the district court because a defense expert could not state that an alternative theory of causation was ''more likely than not'' the cause of the plaintiff's injuries); *Black's Law Dictionary* 1201 (6th ed. 1990) (defining probability as ''[a] condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it'').

need not be stated as being more likely than not. This lowered standard is necessarily predicated on whether the defense expert includes the plaintiff's causation theory in his or her analysis. If the defense expert does not consider the plaintiff's theory of causation at all, then the defense expert must state any independent alternative causes to a reasonable degree of medical probability because he or she then bears the burden of establishing the causative fact for the trier of fact. Otherwise, the testimony would be "incompetent not only because it lacks the degree of probability necessary for admissibility but also because it does nothing to controvert the evidence of appellants." *Stinson*, 633 N.E.2d at 538.

In *Wilder v. Eberhart*, 977 F.2d 673, 676-77 (1st Cir. 1992), the First Circuit Court of Appeals considered a similar issue in a medical malpractice action. The court held that requiring a defense expert to identify a specific cause to a medical probability standard when rebutting the plaintiff's prima facie case would improperly shift the burden to the defendant. *Id.* Thus, the court concluded, defense experts may offer several alternative causes to rebut the plaintiff's theory of cause with less than 50-percent certainty. *Id.* at 677.

We agree with the *Wilder* court's holding, and it logically comports with our conclusion that when a defense expert's testimony is used to contradict a plaintiff's causation theory by comparing that theory to other plausible causes, each additional cause does not need to be stated to a greater-than-50-percent probability. To hold otherwise would severely hinder a defendant's ability to undermine the causation element of the plaintiff's case and could result in an unfair shifting of the burden of proof to the defendant. As illustrated by the *Wilder* court,

> if ninety-nine out of one hundred medical experts agreed that there were four equally possible causes of a certain injury, A, B, C and D, and plaintiff produces the one expert who conclusively states that A was the certain cause of his injury, defendant would be precluded from presenting the testimony of any of the other ninety-nine experts, unless they would testify conclusively that B, C, or D was the cause of injury. Even if all of defendant's experts were prepared to testify that any of the possible causes A, B, C or D, could have equally caused plaintiff's injury, so long as none would be prepared to state that one particular cause, other than that professed by plaintiff more probably than not caused plaintiff's injury, then defendant's experts would not be able to testify at all as to causation. We think that such a result . . . would be manifestly unjust and unduly burdensome on defendants.

977 F.2d at 677. Further, the *Morsicato* standard is not meant to preclude a defendant from undermining the plaintiff's prima facie

case with relevant, medically competent expert testimony on alternative causation theories so long as the defense expert's testimony is being used to controvert the plaintiff's theory.

Although we recognize a lower standard for rebuttal expert testimony regarding medical causation, any alternative causation theories proffered by a defense expert to controvert the plaintiff's theory of cause are still subject to certain threshold requirements, namely that medical experts testifying as to cause must avoid speculation. *See Morsicato*, 121 Nev. at 157-58, 111 P.3d at 1115; *see also Stinson*, 633 N.E.2d at 538 ("[A]n expert for the defense is precluded from engaging in speculation or conjecture with respect to possible causes."). The defense expert's testimony must also be relevant and supported by competent medical research. *See Higgs v. State*, 126 Nev. 1, 18, 222 P.3d 648, 659 (2010) ("[T]he qualification, assistance, and limited scope requirements . . . ensure reliability and relevance."). Therefore, if Dr. Cohen's testimony in Docket No. 56928 is introduced to contradict the Williams Petitioners' and the Pagan Parties' theory as to how they contracted hepatitis C by providing an alternative causation theory, then he does not need to testify to a reasonable degree of medical probability as long as his opinion about the alternative theory is relevant and supported by competent medical research. If his testimony meets these standards, it is admissible and will assist the trier of fact.

Accordingly, for the reasons set forth above, we grant in part and deny in part the Williams Petitioners' petition for extraordinary writ relief and direct the clerk of this court to issue a writ of mandamus in Docket No. 56928 instructing the district court to set aside that portion of its order allowing Nurse Hambrick to testify as to medical causation. We further grant in part and deny in part Sicor's petition for extraordinary writ relief and direct the clerk of this court to issue a writ of mandamus in Docket No. 57079 instructing the district court to set aside that portion of its order excluding Nurse Hambrick from testifying as an expert witness on the subjects of proper cleaning and sterilization procedures for endoscopic equipment. Nurse Hambrick may testify within his area of expertise; however, because we conclude he does not possess the requisite qualifications, he may not testify as to medical causation.[9]

DOUGLAS, C.J., and CHERRY, SAITTA, and GIBBONS, JJ., concur.

---

[9]We vacate the stays of these cases issued on October 14 and November 4, 2010.